# IN THE U.S. DISTRICT COURT FOR THE MIDDLE DISTIRCT OF TENNESSEE, NASHVILLE DIVISION

| | | |
|---|---|---|
| **ANTHONY LADD, on behalf**<br>**of himself and all others similarly situated,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff** | ) | **No. _____** |
| | ) | |
| **v.** | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| **NASHVILE BOOTING, LLC** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant** | ) | |
| | ) | |

---

## CLASS ACTION COMPLAINT

---

Plaintiff Anthony Ladd ("Plaintiff") brings this action on behalf of himself and a class of similarly situated individuals against Defendant Nashville Booting, LLC ("Defendant" or "Nashville Booting") and allege as follows:

### NATURE OF THE ACTION

1.    Nashville Booting is a professional parking enforcement company that enforces private parking rules on private property, by immobilizing vehicles with booting devices and then requiring vehicle owners to pay $50.00 to have the booting devices be removed.

2.    Nashville Booting enters into agreements with private property owners in Nashville (*e.g.*, parking lot owners, businesses, homeowners' associations) to enforce those property owners' private parking rules. Nashville Booting makes money by immobilizing vehicles on private property with a booting device only Nashville Booting can remove and then by charging the person who owns or is in possession of the vehicle a fee to remove their booting device.

3.     Since Nashville Booting's profitability is directly linked to the number of cars it "boots," Nashville Booting has developed a business model to incentivize private property owners

to allow Nashville Booting to boot vehicles on their property. And as a company, Nashville Booting dedicates its resources to maximizing the number of vehicles it "boots" on those private properties.

4.     To incentivize property owners to allow Nashville Booting to boot vehicles on their property, Nashville Booting not only offers to enforce the property owners' parking rules "cost free" to the property owner, but also promises to recover unpaid parking fees, fines, and other debts the vehicle owner ostensibly owes to the property owner.

5.     Once Nashville Booting gains the property owner's blessing to boot vehicles on its property, Nashville Booting deploys significant resources to ensure that infracting vehicles are booted as fast as possible – often within minutes – so that revenue is not lost by a vehicle owner remedying the parking infraction before the vehicle can be immobilized.

6.     Since Nashville Booting's profitability is directly linked to the number of vehicles it boots, Nashville Booting deploys its resources to maximize the number of vehicles it boots.

7.     Although Nashville Ordinance authorizes Nashville Booting to boot infracting vehicles to enforce a private property owner's parking rules, Nashville Booting is only authorized to keep a vehicle booted for a limited amount of time. Once a vehicle owner or operator contacts Nashville Booting to request removal of a booting device, Nashville Booting *must remove* the booting device *within one hour*. It is unlawful for Nashville Booting to keep a vehicle immobilized for longer than one hour after the vehicle owner contacts Nashville Booting to have the boot removed. Nashville Ordinance § 6.81.170(E).[1]

8.     Although Nashville Booting consistently mobilizes its resources to expeditiously boot cars, often within minutes of an infraction, Nashville Booting systemically fails to timely

---

[1] A copy of Nashville's Ordinance, Chapter 6.81, regarding Booting Services, is attached as **Exhibit 1**.

remove its booting devices from immobilized vehicles within the one hour timeframe of being contacted to do so, in violation of Nashville Ordinance § 6.81.170(E).

9.      When Nashville Booting fails to timely remove its booting devices within one hour of a vehicle owner's request to do so, Nashville Booting wrongfully and unlawfully interferes with the vehicle owner's use and enjoyment of their vehicle. This interference is intentional because Nashville Booting choses to prioritize booting new vehicles (and increasing its profits) over removing its booting devices from immobilized vehicles.

10.     On October 26, 2019, Nashville Booting unlawfully interfered with Plaintiff's use and enjoyment of his vehicle by failing to remove a booting device within one hour of when Plaintiff contacted Nashville Booting to request that Nashville Booting do so. Plaintiff brings this class action to recover damages on behalf of himself and others similarly situated to remedy Nashville Booting's unlawful booting practices.

## PARTIES

11.     Plaintiff Anthony Ladd is an adult citizen and domicile of the State of Tennessee. Plaintiff resides in Nashville, Tennessee.

12.     Defendant, Nashville Booting, LLC is a limited liability company formed in Georgia. Nashville Booting's principal place of business is located at 1300 Division Street, Suite 209, Nashville, TN 37203. Nashville Booting operates in Nashville, Tennessee.

## JURISDICTION AND VENUE

13.     <u>Subject Matter Jurisdiction</u>. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state different from Defendant.

3

14. <u>Personal Jurisdiction</u>. The Court has both specific and general personal jurisdiction over Nashville Booting because the conduct at issue occurred in Tennessee and Nashville Booting engages in continuous and systematic business contacts within the State of Tennessee (including in Nashville) and maintains a substantial physical presence in this State, including the operation of an office in Nashville (its principal place of business).

15. <u>Venue</u>. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)-(c) because Nashville Booting resides in this District, has an office in this District, and conducts business in this District. Moreover, the conduct at issue in this lawsuit occurred within this District.

16. Venue in this District is proper pursuant 15 U.S.C. §§ 15, 22, and 26, because Nashville Booting inhabits, transacts business, resides, is found, and has an agent in this district. Further, a significant portion of the affected interstate trade and commerce described below has been carried out in this District.

## **FACTS**

17. A "booting device" or "boot" is a device that prevents a vehicle from moving when the device is locked onto one or more of a vehicle's wheels. The device looks like this:



18.     While booting devices were historically associated with and used only by law enforcement, Nashville has turned booting over to private enterprise and it has become a booming business in the city.

19.     Although Nashville is one of the largest and fastest growing metropolitan areas in the Southeast and a top tourism destination, residents and visitors still rely heavily on cars for transportation.

20.     To accommodate these vehicles, more than 10,000 parking spaces are offered by privately-owned parking facilities throughout Nashville.

21.     Nashville Ordinance prohibits private property owners, including parking facility operators, from booting another person's vehicle and only allows licensed booting companies to boot vehicles. Nashville Ordinance § 6.81.170(G), 6.81.015.

22.     Nashville Booting is one of only two companies authorized to "boot" vehicles in Nashville.

23.     While Nashville Ordinance allows Nashville Booting to boot vehicles, it also imposes strict requirements on booting, and  makes it unlawful to boot a vehicle in violation of these requirements. These limits were imposed to protect the public welfare.

24.     For example, a booting company can only charge a vehicle owner a maximum of $50.00 to remove booting device(s) from the vehicle. And it is unlawful "to fail to remove the booting device within one hour of being contacted by the owner or operator of the vehicle that has been booted." Nashville Ordinance § 6.81.170(E).

A.     **Nashville Booting's Business Model and Systemic Violation of Vehicle Owners' and Operators' Rights.**

25.     Nashville Booting earns most, if not all, of its revenue from fees that it charges vehicle owners and operators to remove booting devices it has placed on their vehicles. Nashville

Booting charges vehicle owners $50.00, the maximum amount permitted by Nashville Ordinance § 6.81.140.

26.     Nashville Booting has created and maintained a business model designed to boot a massive volume of vehicles in Nashville by: (a) incentivizing a large number of private property owners to allow Nashville Booting to boot vehicles on their property; and (b) mobilizing resources to boot infracting vehicles as soon as possible, before the vehicle owner can remedy the infraction.

27.     Nashville Booting markets itself to private property owners as a "cost free solution" for private parking enforcement. At *no cost* to the private property owner, Nashville Booting will monitor the property for parking infractions, boot any infracting vehicle, and recover unpaid fees owed by the vehicle owner or operator to the property owner.

28.     Nashville Booting solicits its services to all types of commercial, residential, and mixed-use property owners in Nashville at no cost to the property owner.

29.     Even where the property owner has no existing parking restrictions or management, Nashville Booting offers "turnkey parking solutions and enforcement . . . at no cost to property management."[2] Nashville Booting advertises on its website that it will provide a free site analysis to the property owner, a custom enforcement plan for any property, and will "guide property managers through implementation of a permit parking system and tracking plan."[3]

30.     Nashville Booting even markets its booting services to homeowners' associations as a "cost free" way to leverage residents into paying past-due association fees. On its website, Nashville Booting states as follows:

> Nashville Booting assists with recovering delinquent homeowners association dues by immobilizing vehicles until the owner has become current with their dues. This

---

[2] http://nashvillebooting.com/portfolio/residential-parking/
[3] http://nashvillebooting.com/nb-advantages/

6

is a cost free tool for homeowner associations to re-coup past due association fees in a timely manner.[4]

31.    Nashville Booting targets a broad range of property owners and offers its "cost free" services – including turnkey parking solutions – simply to maximize its ability boot more cars.

32.    Nashville Booting also enforces parking rules by booting infracting cars parked at paid parking lots, including all Nashville-area parking lots owned by Eagle Parking, LLC (an entity owned and operated by the same owners and operators as Nashville Booting).

33.    Eagle Parking, LLC owns and operates paid parking lots at the following locations:

a.    Downtown Nashville at 134 2nd Avenue South, Nashville, TN 37201;

b.    Downtown Nashville at 116 5th Avenue North, Nashville, TN 37219; and

c.    Gulch area at 1300 Division Street, Nashville, TN 37203.

34.    Nashville Booting derives significant revenue from enforcing parking rules at these lots.

35.    Once a property owner agrees to allow Nashville Booting to enforce parking rules on its property, Nashville Booting implements processes and technologies, including video surveillance, to quickly identify and boot any infracting vehicles before the vehicle owner or operator remedies the infraction.

36.    On October 22, 2018, Nashville WSMV published a news story about car owners who had been booted by Nashville Booting "within minutes" of their paid parking time expiring.[5] Local musician Michael Allen described his experience with Nashville Booting as follows:

> "A computer reads when you park, and they come by and check it, and if you're two minutes late, you got a boot."

---

[4] http://nashvillebooting.com/portfolio/hoa-recovery-solutions/
[5] Copy attached as **Exhibit 2**.

"It happens at night. A lot at night, a lot at weekends…"

37.     WSMV aired another similar news story on May 22, 2019. The vehicle owner in the story found that his car had been booted when he returned to his parking spot about 30 minutes late.

38.     From one online review posted on May 10, 2019, a car owner was parked for less than 7 minutes to pick up food from a restaurant while it was raining, and she returned to her car to find that a Nashville Booting technician had already placed immobilization boots on her car.

39.     While Nashville Booting quickly mobilizes its resources to boot infracting vehicles before an infraction can be remedied, Nashville Booting routinely boots vehicles for much longer than it is authorized to do so under Nashville Ordinance.

40.     Nashville Ordinance limits the amount of time Nashville Booting can lawfully boot a vehicle. Nashville Booting is required to remove a boot from a vehicle within one hour of receiving a call requesting Nashville Booting do so. Nashville Ordinance § 6.81.170(E).

41.     To effectuate this restriction, Nashville Ordinance requires licensed booting companies, like Nashville Booting, to affix a notice on any vehicle it is booting to the owner of the vehicle identifying the name of the booting company, and "a twenty-four hour telephone number at which the booting service can be reached." Nashville Ordinance § 6.81.130(B)(3). The notice must also reference Chapter 6.81 of the Metropolitan Code regulating the booting of vehicles.  Nashville Ordinance § 6.81.130(B)(5).

42.     When a vehicle owner calls this number, Nashville Booting must then unboot the car within one hour. Nashville Ordinance § 6.81.170(E). However, Nashville Booting systemically fails to do so.

8

43.     Nashville Booting deliberately chooses to prioritize deploying its resources to immobilize cars, within minutes of an infraction, than to timely release boots from vehicles because this prioritization of resources increases its profitability.

44.     This is because if Nashville Booting fails to act with sufficient haste in booting a vehicle, it loses the fee it could charge that vehicle owner or operator to remove the boot. However, Nashville Booting is the only entity that can remove one of its booting devices, so it has no market incentive to prioritize its resources toward timely removing its booting devices.

45.     The Better Business Bureau ("BBB") is a non-profit consumer site that gives ratings to businesses and helps consumers raise and resolve complaints with local businesses.

46.     The Better Business Bureau has given Nashville Booting an "F" grade and has issued an "alert" about Nashville Booting due to "a pattern of complaint[s] alleging billing and collection issues and customer service issues [by Nashville Booting]." These issues specifically includes a pattern of complaints that "although Metro Nashville Ordinance 6.81.170(E) states that it is prohibited and unlawful to fail to remove the boot within one hour of being contacted by the owner or operator of the vehicle that has been booted, they had to wait anywhere from over 1 hour to 5 hours."[6]

47.     Complaints published on BBB's website[7] demonstrate that this issue is systemic and ongoing:

   a.   3/12/2020: "Violation of Nashville Booting Code - boot not removed within an hour. … It took longer than an hour for them to arrive and remove the boot."

   b.   1/28/20: "I called the dispatch service at approximately 9:15am to have the boot removed; the technician arrived at 10:55am."

   c.   1/21/20: I call at 12:23 am I'm still waiting at my car at 2:38 am, when I call customer service they are very rude, they put people on danger My car have boot,

_____

[6] Attached as **Exhibit 3**.
[7] Attached as **Exhibit 4**.

I just call the company at 12:23 am is about 3 hour waiting for they send somebody to remove the boot I call and the only they say they can do nothing"

d. <u>12/09/19:</u> "Unacceptable wait time after having car booted in violation of Nashville law. Rude customer phone line who advised 'patience' with more than 3 hours. In direct violation of Nashville Ordinance 6.81.170(E) which requires them to remove the boot within one hour, Nashville booting and Technician 201 have kept me waiting since my original call at 08:39 this morning (December 7th 2019). It is now 11:56. Multiple calls to the call centre have had them advise 'patience' and even an accusation of me holding them up 'as they have other customers to attend to' when I am quite literally being held up."

e. <u>10/28/2019:</u> "Have waited over 5 hours since the time of my first call to have the boot removed. Nashville law states that it must be within 1 hour of my call I have been waiting over 5 hours since my initial phone call to get this boot removed. Technician 201 booted my vehicle on 10/25/19 at 9:15 pm. Nashville law states that they must arrive within 1 hour of the customers initial phone call."

f. <u>9/10/2019:</u> "Second time that my car has been booted with out reason First time my car was booted in my own apartment parking garage. When we called the lady kept telling us 30 min he will be there. Took them over 3 hours on a Saturday. We had to cancel our plans. We had guest that were from out of town. … After 5-6 months I had forgotten about it, but it never got processed. Now my car is booted again for the same reason. Still waiting, it's been 6 hours. And the person on the other line has hung up on my serval times. She had no care that I've been waiting, that my plans have been ruined, Again. If Nashville booting company is going to go around booting cars willy nilly. Then they should be available to un boot the car."

g. <u>8/13/19:</u> "I called to have my boot removed and they failed to come within the legally mandated period of time. I had my car booted on July 23rd, 2019 and called to have the boot removed at 11:29 AM. I was told by the woman on the phone that I had to stay at my car and I was given no estimation of when somebody would arrive to remove my boot. I waited for around 50 minutes in my car on a hot day until I called again to see if anything was being done. The phone operator told me that they could do nothing and were just a third party. I waited for another half hour before I finally received a call from a person who was coming to remove my boot. At this point I had been waiting for over an hour … When I informed the technician that she was in violation of the ordinance she began to belittle and tell me that she was only a little late and had not seen the notification on her phone. She said that I should not be worried about the time that I was forced to wait even though I had a number of things to do that day and I would not be able to finish them all after waiting for so long. … On my receipt she wrote that the call came in at 11:30 AM but she did not see it until 12:40 PM. She was not checking her phone that tells her where to go on her job. I called their office 3 times over the next 3 days and was continually told to leave my number and they would get back to me within 24-48 hours which never occurred."

10

h.  3/20/19: "The booting company showed up 3 hours after we called to have the boot removed."

i.  3/13/19: "When I called for a removal, the technician arrive (2 hours after promised time)"

j.  2/25/19: "Did not provide service within the legally mandated time period I called immediately once I discovered my car was booted. My first call was at 9:29 am. The call center told me they were paging the technician. Twenty minutes later I hadn't heard anything so I called again. They said they'd page all the techs in the area. Another 30+ minutes later I called back, and they said the only thing they could do was to page the technicians again. Still nothing. I called AGAIN another 20 minutes later, by this time it's 10:45, and the person on the other end of the line just kept repeating that she was a third party and all she could do was to page the techs, obviously an unsatisfactory solution since I'd been waiting more than an hour already. FINALLY at 10:55 I received a call from a technician who said he was on his way. I was basically trapped at my car for an hour and a half before finally getting the boots removed at 11:05."

k.  6/26/18: "Violated Nashville Ordinance 6.81.170(E) by failing to remove boot within hour after I called number. Tech did not call for 1 hr 45 mins."

**B.  Plaintiff's Experience with Nashville Booting.**

48.  Plaintiff's experience is typical of Nashville Booting practices.

49.  On October 26, 2019, Nashville Booting booted Plaintiff's car at 6:30 a.m.

50.  Nashville Booting affixed a sticker on Plaintiff's car telling the Plaintiff to call Nashville Booting at (615) 414-0501 to have the boot removed.

51.  Plaintiff called that number at 8:51 a.m. on October 26, 2019. The number connected him to a recording that said to call a different number, (866) 383-6060.

52.  Plaintiff then called the (866) 383-6060 number at 8:52 a.m., and again at 8:59 a.m., to request that Nashville Booting remove the boot it had placed on Plaintiff's car. During that call, the operator told Mr. Ladd that he would have to wait because Nashville Booting "had approximately 100 other boots to remove."

11

53.     Nashville Booting did not remove the boot from Plaintiff's car within one hour, as required by Nashville Ordinance.

54.     Nashville Booting did not remove the boot from Plaintiff's car until 5:39 p.m. on October 26, 2019, more than eight hours after Plaintiff Anthony Ladd had called to request Nashville Booting remove the boot.

55.     Nashville Booting unlawfully immobilized Plaintiff's car for more than seven hours, in direct violation of Nashville Ordinance.

56.     As a result of Nashville Booting's deliberate failure to remove its boot from Plaintiff's vehicle, Plaintiff was denied the use and benefit of his vehicle and Plaintiff spent most of the day waiting in frustration for Nashville Booting to end its unlawful immobilization of his vehicle.

57.     Plaintiff continues to live in the Nashville area and routinely uses various private parking areas where Nashville Booting boots cars.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action, pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4) seeking monetary and injunctive relief for Nashville Booting's unlawful practices. This action is brought on behalf of the following class:

> All persons who have had a vehicle in their possession immobilized by Nashville Booting LLC in Nashville for longer than one hour after requesting removal of the immobilization device, from three years prior to the filing of this lawsuit up to the date the class is certified.

59.     Excluded from this class are the Court and its officers, employees, and relatives; Defendants, their parents, subsidiaries, affiliates, shareholders, and co-conspirators; and the federal government.

60.     Members of the class are so numerous and geographically dispersed across the

12

United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiff at this time, it is believed to be in the thousands. Furthermore, the class is readily identifiable from information and records in possession of the Defendant.[8]

61.     There are numerous questions of law and fact common to members of the class. Among the common questions of law are: (a) whether Nashville Booting's immobilization of a vehicle beyond the time permitted by law constituted negligence, negligence *per se*, conversion, and/or trespass to chattel under Tennessee law; (b) was Nashville Booting was simply negligent in failing act fast enough to remove immobilization devices, or did it deliberately chose to prioritize its resources towards placing new immobilization devices (often within minutes of an infraction) over removing already-placed boots within the time period required by law; (c) whether compensatory and/or punitive damages are warranted for the class; and (d) whether an injunction should be entered requiring Nashville Booting to remove booting devices within the time period required by law following a vehicle owner or operator's request. These questions of law and fact common to members of the class predominate over questions, if any, that may affect only individual class members

62.     Plaintiff's claims are typical of the class. Members of the class were all damaged by the same wrongful conduct by Nashville Booting.

63.     Plaintiff will fairly and adequately protect the interests of other class members because he has no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiff is committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent Plaintiff and other members of the class.

---

[8] Nashville Ordinance § 6.81.120 requires Nashville Booting to maintain these records.

13

64. The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendant.

65. A class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly-situated persons and/or entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. The damages sustained by individual class members, although meaningful, do not rise to the level where they would have a significant interest in controlling the prosecution of separate actions against this well-financed corporate Defendant.

66. The instant case will be eminently manageable as a class action. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### I. Negligent Bailment

67. Plaintiff repeats and realleges the allegations in Paragraphs 1-66 above as if fully set forth herein.

68. Nashville Booting's immobilization of Plaintiff's vehicle and the vehicles of other members of the putative class constituted a constructive and/or involuntary bailment under Tennessee law.

69. Nashville Booting's constructive and/or involuntary bailment of the vehicles of Plaintiff and other members of the putative class was a bailment of limited duration because it

expired one hour after the respective vehicle owner/operator contacted Nashville Booting to request a removal of the immobilization device.

70.     At the end of the constructive and/or involuntary bailment, Nashville Booting was required to return possession of the vehicles of Plaintiff and other members of the putative class in the same working condition as existed prior to the booting of the vehicle.

71.     Nashville Booting negligently failed to return possession of the vehicles of Plaintiff and other putative class members by the end of Nashville Booting's constructive and/or involuntary bailment of those vehicles.

72.     As a direct and proximate result of Nashville Booting's negligent failure to remove their booting devices by the conclusion of their involuntary/constructive bailment, Plaintiff and other members of the putative class were denied use and enjoyment of their vehicles and suffered other compensable damages.

## II.     Negligent Bailment *Per Se*

73.     Plaintiff repeats and realleges the allegations in Paragraphs 1-72 above as if fully set forth herein.

74.     Nashville Booting's conduct was negligent *per se* because it violated Nashville Ordinance § 6.81.170(E).

75.     Plaintiff and other members of the putative class were within the class of people that Nashville Ordinance § 6.81.170(E) was designed to protect because the Nashville booting ordinance is designed to promote the "welfare of the public." Nashville Ordinance § 6.81.010.[9]

76.     The injury suffered by Plaintiff and other members of the putative class was the

---

[9] The Nashville Ordinance also contemplates that booting companies may act in violation of members of the public's legal rights, and requires – as a condition of licensure – that booting companies such as Nashville Booting maintain liability insurance with a policy limit of no less than $1,000,000. Nashville Ordinance § 6.81.040.

type of injury that Nashville Ordinance § 6.81.170(E) seeks to prevent. The specific prohibition against booting a car for more than an hour after being contacted by the owner or operator of the vehicle was intended to benefit the owner or operator of the car.

77.     Nashville Booting's violation of Nashville Ordinance § 6.81.170(E) was the direct and proximate cause of the injuries sustained by Plaintiff and other members of the putative class alleged herein.

### III.     Conversion

78.     Plaintiff repeats and realleges the allegations in Paragraphs 1-77 above as if fully set forth herein.

79.     Plaintiff and other members of the putative class had a right to the possession and use of their vehicle.

80.     Nashville Booting deliberately continued to exercise dominion over the vehicles of Plaintiff and other members of the putative class, and prevented Plaintiff and other members of the putative class from the use and enjoyment of their vehicles beyond the duration of Nashville Booting's constructive and/or involuntary bailment of those vehicles.

81.     Nashville Booting specifically intended to continue to impair the value and the use of the vehicles by  Plaintiff and other members of the putative class because it is precisely this impaired value of the vehicle that Nashville Booting uses as leverage to force payment of fees to unboot those vehicles.

82.     Nashville Booting has intentionally engaged in a systemic practice of prioritizing applying new booting devices over timely removing previously-placed booting devices within the timeframe required by law. In so doing, Nashville Booting has deliberately prioritized its ability

16

to capture additional revenue over Plaintiff and other members of the putative class' lawful rights to use and enjoy their vehicles.

83.     Nashville Booting unlawfully converted the vehicles of Plaintiff and other members of the putative class for their own purpose beyond the period of time authorized by law – to hold those vehicles as collateral to force Plaintiff and other members of the putative class to pay fees to property owners and to Nashville Booting.

84.     As a direct and proximate result of Nashville Booting's conversion of Plaintiff and other members of the putative class' vehicles after conclusion of their involuntary and/or constructive bailment, Plaintiff and other members of the putative class were denied use and enjoyment of their vehicles and suffered other compensable damages.

85.     Plaintiff and other members of the putative class should also be awarded punitive damages because Nashville Booting's conduct was intentional and reckless. Furthermore, Tennessee law recognizes the availability of punitive damages for a claim of conversion.

### IV.     Trespass to Chattel

86.     Plaintiff repeats and realleges the allegations in Paragraphs 1-85 above as if fully set forth herein.

87.     Nashville Booting's placement of an immobilization device on the vehicles of Plaintiff and other members of the putative class, and failure to timely remove those boots, impaired the value of those vehicles, as those vehicles could no longer be used for their intended purpose (i.e., transportation).

88.     As a result of Nashville Booting's placement of immobilization devices on the vehicles of Plaintiff and other members of the putative class, and failure to timely remove those

17

boots, Plaintiff and other members of the putative class were deprived the use and enjoyment of their respective vehicles for a substantial amount of time.

89.     Plaintiff and other members of the putative class did not consent to Nashville Booting's placement of a boot on their vehicles, or to Nashville Booting's failure to timely remove those boots.

90.     Nashville Booting's interference with Plaintiff and other members of the putative class' use of their vehicles was only privileged for a limited duration of time, and that privilege expired one hour after Plaintiff and other members of the putative class called Nashville Booting to have the boots removed.

91.     Nashville Booting interfered with Plaintiff and other members of the putative class' use and enjoyment of their vehicles, without privilege or consent.

92.     Plaintiff and other members of the putative class should also be awarded punitive damages because Nashville Booting's conduct was intentional and reckless. Tennessee law recognizes the availability of punitive damages for a claim for trespass to chattel.

## V.     Violations of 42 U.S.C. § 1983

93.     Plaintiff repeats and realleges the allegations in Paragraphs 1-92 above as if fully set forth herein.

94.     When Nashville Booting boots and unboots vehicles in Nashville, including the vehicles of Plaintiff and other members of the putative class, it does so under color of law. First, booting vehicles and removing a boot from a vehicle is a power that was traditionally and exclusively held by the state. It remains unlawful in Nashville, except for Nashville Booting and one other closely-regulated licensee, to boot a vehicle on private property. Second, Nashville's licensure process, administrative oversight, and regulations demonstrate a sufficiently close

18

connection between the Nashville government and Nashville Booting, such that the conduct of Nashville Booting can be fairly attributable to the Nashville metropolitan government itself.[10][11]

95.     Plaintiff and other members of the putative class had a property right in the possession and use of their vehicles.

96.     Nashville Ordinance § 6.81.170(E) serves to limit the length of time a vehicle can be immobilized once a request to remove the boot has been made.

97.     Nashville Booting wrongfully deprived Plaintiff and other members of the putative class of their property rights in the possession and use of their vehicles under color of law by continuing to deprive the Plaintiff and other members of the putative class of their property right in their possession and use of their vehicles beyond the period of time authorized by law in connection with the placement of a booting device.

98.     As a result of Nashville Booting's wrongful deprivation of the property rights of Plaintiff and other members of the putative class, Plaintiff and other members of the putative class suffered damages.

99.     Plaintiff and other members of the putative class should also be awarded punitive damages because Nashville Booting's conduct was intentional and reckless.  Punitive damages are available in connection with a § 1983 claim.

---

[10] *See* Exhibit 1 hereto.
[11] In recognition that these regulations create such a close agency-like relationship, Nashville Ordinance requires Nashville Booting to name the Nashville metro government as an "additional insured" on its liability insurance policy. Nashville Ordinance 6.81.040.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, on his own behalf and on behalf of the class, demands a trial by jury of all claims asserted in this Complaint so triable.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests entry of judgment:

1. Certifying that this action may be maintained as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiff as class representative and his counsel as lead class counsel;

2. Directing that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure be given to members of the class;

3. Awarding Plaintiff and the class their full monetary damages to be proven at trial;

4. Awarding Plaintiff and the class punitive damages;

5. Awarding Plaintiff and the class pre-and post-judgment interest on their damages;

6. Awarding Plaintiff and the class the costs of this action and reasonable attorneys' fees, including pursuant to 42 U.S.C. § 1988;

7. Entry of an injunction requiring Nashville Booting to remove immobilization devices from vehicles within one hour of being contacted by the owner or operator of the vehicle.

8. Awarding Plaintiff and the class such other and further relief as the Court deems just and proper.

DATED: July 20, 2020

Respectfully submitted,

By: /s/Mark Hammervold
Mark Hammervold, TN #31147
Daniel Kotchen (*pro hac vice* forthcoming)
Daniel Low (*pro hac vice* forthcoming)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
mhammervold@kotchen.com;
dkotchen@kotchen.com
dlow@kotchen.com

*Attorneys for Plaintiff and
the Putative Class*

21